# IN THE MATTER OF DENNIS ALAN CIPRIANO, AN ATTORNEY AT LAW.

Argued September 9, 1975—Decided October 20, 1975.

*Mr. Nino D. Caridi* argued the cause for the Central Ethics Unit of the Administrative Office of the Courts.

*Mr. Morris M. Schnitzer* argued the cause for the respondent.

PER CURIAM. Upon the petition of the Central Ethics Unit, we issued an order to show cause why the respondent Dennis Alan Cipriano, a member of the bar of this State, should not be disbarred or otherwise disciplined for the conduct referred to herein.

Respondent was retained in May 1971 to represent the Forest Hill Tenants' Association, an association composed exclusively of tenants of Forest Hill Gardens in Bloomfield, New Jersey, with respect to their grievances against their landlord Forest Hill Properties Inc. and its managing agent James E. Palange.

The respondent filed a complaint in the Superior Court, Chancery Division, on behalf of Arthur Meltz, a tenant, and for all the other tenants located at Forest Hill Gardens against the landlord and Palange. The complaint alleged and identified in detail various "intolerable conditions" which the landlord had refused to remedy, noted that about 315 tenants had paid their May rent to Mr. Meltz as trustee, and recited that the landlord had instituted dispossess proceedings against the tenants who had not paid the May rent. The plaintiff sought the appointment of a receiver, an order to compel the landlord and James E. Palange to make the necessary repairs, and dismissal of the tenancy proceedings. The suit was instituted with an order to show cause dated June 7, 1971.

The parties entered into a consent order on June 23, 1971 which provided *inter alia* that respondent would be a co-trustee of the rents collected by the Tenants' Association, all

of which were to be paid to the landlord less 10%. The deducted amount was to be security for the landlord's performance of certain repairs. Respondent was to serve on a committee which was to inspect the premises and submit a report to the landlord of necessary repairs. The order also provided that the landlord could not increase monthly rent more than $25 in excess of the April 1971 rent.

On August 9, 1971 a consent order of dismissal was entered. It provided that all remaining trust funds be paid to the landlord, that all repairs be completed as soon as possible, and that a written lease, containing the provisions set forth in a letter dated July 22, 1971 which respondent had written to the landlord's attorney, be entered into with each member of the Forest Hill Tenants' Association. The letter, a copy of which was attached to the order, referred to a written lease to be prepared by respondent. It recited 12 numbered paragraphs of provisions, one of which provided that rents would be increased $17.50 in the first year of the lease and an additional $17.50 in the second year.

Respondent did not prepare a lease until January 1972, when he was requested to do so by Mrs. Betty Hutchinson, who served on the tenants' executive committee which replaced Mr. Meltz, who had been president of the Forest Hill Tenants' Association and had moved to Florida. The respondent had not prepared the leases because his bill was unpaid.

In October 1972 respondent began to represent the landlord in summary dispossess actions for nonpayment of rent against tenants in Forest Hill Gardens. He processed about 15 such cases a month. He has continued this type of representation down to the present.

In the meantime, the conflict between the Tenants' Association (which was subsequently called the Forest Hill Tenants' Organization) and the landlord and its agent James Palange persisted. In August 1973 proceedings were instituted by Forest Hill Properties Inc. to enforce the consent order of August 9, 1971 to collect the second $17.50 referred to

therein. Because of the Presidential price freeze the $17.50 increase had not become effective in May 1972 as contemplated. In the summer of 1973 the Tenants' Organization was distributing news bulletins to the tenants which contained charges against the landlord and its agent Palange concerning rent increases, including the $17.50 item, and the physical condition of the apartments and environs.

On December 11, 1973 respondent wrote to Mrs. Hutchinson and other members of the tenants' executive committee asserting that the language in the bulletins defamed Mr. Palange and demanded a retraction. On January 1, 1974 Mrs. Hutchinson and two other tenants complained to the Essex County Ethics Committee that respondent's position "as the landlord's attorney is a conflict of interest" and that "he must have given our landlord much privileged information." The bulletins had been reproduced at the Book Components Press, Inc. at the instance of its employee Pierre Morin who was also a tenant. Respondent wrote a letter to Book Components Press, Inc. and charged that it had published libelous material, demanded written retractions and suggested that notwithstanding retraction suit might be instituted against it for libel. On January 22, 1974 Morin brought the contents of this letter to the attention of the Essex County Ethics Committee.

In May 1975 respondent instituted an action in the Superior Court on behalf of Palange and himself against Betty Hutchinson, Pierre Morin, and other members of the Forest Hill Tenants' Organization. This complaint generally assailed the literature distributed by the Tenants' Organization as libeling Palange. It also charged that, because of the statements made in the compaint to the Essex County Ethics Committee, respondent's economic and contractual rights had been interfered with and he had been libeled.

Although numerous charges and countercharges have been made and the hearings before the Essex County Ethics Committee contain conflicting factual assertions, certain indis-

putable facts make it clear that respondent's conduct was not in the best traditions of the bar.

The complaint charged that respondent had been representing the landlord in actions against the very same tenants whom he had previously represented against the landlord. This allegation is not expressly denied in the answer. Rather, respondent makes the specious contention that he represented the Association and not the tenants. This position belies the Superior Court, Chancery Division, complaint which he drew, wherein all the tenants were represented, and fails to square with the reality that even as to the Association all its members were his clients. He also argues that the Forest Hill Tenants' Association disbanded and the Forest Hill Tenants' Organization is a different entity. The record does not support this allegation. It appears that there was simply a charge of name. In any event the real parties in interest remained the same — the tenants. Further, it is clear that the libel action is being maintained against tenants who had been members of the Association at the time he represented them.

██ ██ Respondent claims that he may not be disciplined because no Disciplinary Rule proscribing the specific conduct has been violated. We have previously commented that "[t]his Court's disciplinary power is not confined to the area covered by the canons." *In re Blatt,* 42 *N. J.* 522, 524 (1964); *In re Russell,* 59 *N. J.* 315 (1971). The same principle is applicable to the Disciplinary Rules which carry the general admonitions that a lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice", *DR* 1–102(A)(5), or in any conduct "that adversely reflects on his fitness to practice law", *DR* 1–102(A)(6). A lawyer is held to the highest standards of ethical and moral uprightness when acting as a lawyer. *In re Ryan,* 66 *N. J.* 147 (1974). He is subject to disciplinary action when he fails to meet those standards.

*DR* 9–101 requires an attorney to avoid "even the appearance of impropriety." Wise, in *Legal Ethics* (1966), has commented:

The impropriety of taking a case against a former client is not based solely on necessity for disclosure of confidential communications. If the former client has any reason to feel aggrieved, the necessity of maintaining proper public relations for the bar and of avoiding the appearance of wrongdoing should cause the attorney to refuse to accept employment in a capacity adverse to the interests of a former client. [at 155].

To maintain public confidence in the bar it is necessary that the appearance of, as well as actual, wrongdoing be avoided. We recently had occasion to make the following comment upon this principle in *State v. Galati*, 64 *N. J.* 572 (1974):

Thus we must notice that in matters of ethics and professional probity, the cause and effect impact upon the public consciousness is almost, perhaps quite, as important as the actual fact. *Cf.* Disciplinary Rule 9–101, exhorting the lawyer to avoid "even the appearance of impropriety." [at 576].

In *In re Blatt, supra,* the court held:

* * * It is self evident that where a member of the bar represents a litigant in a cause, he should not thereafter represent the opposing party in any step in the proceedings in or *arising out of the same cause.* There is always a possibility, however remote, that confidential information received from the original client may be used to his detriment. [42 *N. J.* at 524; emphasis added].

See also *In re Kushinsky*, 53 *N. J.* 1 (1968); *In re Kamp,* 40 *N. J.* 588, 595 (1963).

■ The attorney's actions have not comported with these principles and are subject to reprobation. Representation of the tenants against their landlord and its agent with respect to matters arising out of the tenancy which results in the modification of the terms of the agreement between the landlord and tenant, and subsequent representation of the land-

lord by instituting dispossess proceedings arising out of the *same* relationship and contract against some of the same tenants, is improper.

Furthermore, Palange's libel charges concern statements which involve the identical subject matter with respect to which the respondent had represented the tenants. The tenants' bulletins upon which the libel action is predicated referred to the $17.50 rent increase which was embodied in the August 1971 consent order of dismissal of the action brought by respondent. The bulletins also contained complaints about the condition of the premises which were in need of repair. The nature of the conditions referred to was identical with those which had been asserted in the complaint the respondent had filed on behalf of the tenants less than two years before.

A running dispute between the landlord and Palange on the one hand and the tenants on the other had existed since 1971. To change sides during the struggle, where the subject matter was interrelated with that which the attorney initially handled on behalf of the tenants generates a seeming conflict of interest even if no confidential information had been or would be utilized.

The guiding principle which governs the administration of justice is integrity in the full sense of the word. The thought was well put in *Erwin M. Jennings Co. v. DiGenova,* 107 *Conn.* 491, 141 *A.* 866 (1928), where the court wrote:

Integrity is the very breath of justice. Confidence in our law, our courts, and in the administration of justice is our supreme interest. No practice must be permitted to prevail which invites towards the administration of justice a doubt or distrust of its integrity. [107 *Conn.* at 499, 141 *A.* at 868].

Respondent's conduct here did not meet the ethical standards required of members of the bar. He is hereby reprimanded.

*For reprimand*—Chief Justice HUGHES, Justices MOUN-
TAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and
Judge CONFORD—7.

*Opposed*—None.