788 A.2d 776 (2002)
346 N.J. Super. 460
In the Matter of CITY OF NEWARK, Public Employer-Appellant, and
Association of Government Attorneys, Petitioner-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 2001.
Decided January 14, 2002.
*777 Angelo J. Genova, Livingston, argued the cause for appellant City of Newark, (Genova, Burns & Vernoia, attorneys; Mr. Genova, of counsel; Robert C. Gifford and Brian W. Kronick, on the brief).
Steven P. Weissman, Somerset, argued the cause for respondent Association of Government Attorneys, (Weissman & Mintz, attorneys; Mr. Weissman, on the brief).
Robert E. Anderson, Allendale, argued the cause for the Public Employment Relations Commission, (Mr. Anderson, General Counsel, on the brief).
Before Judges BAIME, NEWMAN and FALL.
The opinion of the court was delivered by *778 BAIME, P.J.A.D.
The novel question presented by this appeal is whether non-supervisory attorneys employed by the City of Newark in its office of corporation counsel may organize and join a union. Following an election ordered by the Public Employment Relations Commission, the Association of Government Attorneys was certified as the employees' representative. The City appeals, contending: (1) the Commission erred in ordering the election, (2) the Rules of Professional Conduct bar municipal attorneys from joining a union, (3) the Commission's decision intrudes upon the Supreme Court's exclusive jurisdiction to regulate the practice of law, (4) collective negotiations conflict with statutes and ordinances providing that the City's lawyers serve at the pleasure of corporation counsel, and (5) as managerial and confidential employees, the attorneys' overriding duty of loyalty to the City precludes them from organizing for the purpose of collective negotiations. We reject these arguments and affirm the Commission's decision.

I.
On September 3, 1999, the Association filed a petition with the Commission requesting certification to represent twenty-eight attorneys employed by the City. The petition was accompanied by a document signed by over thirty percent of the employees expressing their agreement to have the Association "exclusively represent them in the collective bargaining process." See N.J.A.C. 19:11-1.2(a)(9) (petition for certification shall be accompanied by a "showing of interest ... of not less than [thirty] percent of the employees in the unit alleged to be appropriate").
On September 10, 1999, twelve of the attorneys who had signed the "showing of interest" requested the Commission to withdraw the petition, claiming that it had been submitted without their knowledge or approval. They asserted that Salvador Simas, an assistant corporation counsel, had misrepresented the nature of the document. In response, the Association filed an unfair practice charge against the City, accusing Newark's corporation counsel of intimidating members of her staff in an attempt to "dissuade" them from joining the union. The unfair practice charge was held in abeyance pending the Commission's disposition of the Association's petition.
Following his investigation of the City's protest, the Commission's Director of Representation advised the parties that he had found no defect in the petition and that he intended to order an election. The Director further apprised the parties of his preliminary decisions respecting the structure of the proposed negotiating unit. After inviting and receiving the parties' responses, the Director issued his formal decision on April 18, 2000, rejecting the City's claims that the petition was defective and that the attorneys had no right to organize because they were managerial executives or confidential employees. With regard to the proposed unit, the Director excluded the two first assistant corporation counsel on the ground that they were managerial and supervisory employees, and the seven section chiefs for the same reason. In addition, the Director excluded the four attorneys assigned to the labor department and one lawyer assigned to the development section, finding that they were confidential employees. The negotiating unit was thus confined to lower level attorneys with essentially no supervisory authority over other lawyers.
The election was conducted on May 17, 2000. Thirteen of the seventeen eligible voters cast ballots, eleven in favor and two against the Association. On May 25, 2000, the Director certified the Association as *779 the unit's representative. The Commission denied the City's request for review the next day. This appeal followed.

II.
Initially, we reject the City's procedural argument that the Association's "showing of interest" was defective. When an organization seeks to represent a group of employees, its petition must be accompanied by a "showing of interest" of not less than thirty percent of the employees. N.J.A.C. 19:11-1.2(a)(9). The showing of interest is confidential and may not be furnished to the parties. N.J.A.C. 19:11-2.1. This cloak of secrecy is designed to protect the employees against retaliation.
The point to be stressed is that the petition and the requisite "showing of interest" are preliminary, procedural mechanisms designed to ascertain whether there is sufficient support for the selection of an organization to represent the employees for the purpose of collective negotiations. N.J.A.C. 19:11-2.1 provides that the Director shall determine the adequacy of interest and that his determination shall not be collaterally attacked. Once the Director finds that the "showing of interest" is sufficient and that it meets the regulatory requirements, any question concerning the adequacy of the employees' support for the designated union must be determined by secret ballot election, rather than litigation. N.J.A.C. 19:11-4.1.
Any error made in determining a "showing of interest" will be remedied by the election itself. In this case, for example, the election resultcertification of the Associationdiscloses a strong likelihood that there was sufficient support for the union at the time the petition was filed. We acknowledge, of course, that this is not inevitably true and that employees who cast their ballots in favor of the Association may have been against the union when first confronted by the question. But measured by the election result, any error in the preliminary proceedings would be considered harmless.
We emphasize the limited contours of our holding. There may be instances in which a party's conduct in obtaining or filing a petition is so egregious as to justify judicial intervention notwithstanding the otherwise cleansing results of the election. Our endorsement of the Commission's longstanding practice may not be transmogrified into an open sesame for egregious acts of intimidation or fraud. We, nonetheless, are content to decide the case before us. So posited, we perceive no sound basis to disturb the Director's preliminary decision accepting the Association's petition and ordering an election.

III.
We turn to the City's argument that the Rules of Professional Conduct preclude its lawyers from unionizing for the purpose of collective negotiations. The City contends that the interjection of a union will seriously impair the attorney-client relationship by creating dual loyalties. The City further claims that unionization of municipal attorneys creates an appearance of impropriety. In advancing these contentions, the City heavily relies on RPC 1.7(b) and (c)(2). These rules bar an attorney from representing a client if such representation may be "materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests," or if such "multiple representation" might create a perception of impropriety in an "ordinary knowledgeable citizen acquainted with the facts." Ibid.
We find no merit in this contention. There is nothing fundamentally incompatible between the constitutional right of government employees to organize for the *780 purpose of collective negotiations, N.J. Const., art. I, ¶ 19., and the duty of loyalty owed by a municipal attorney to his client. In earlier days, the legal profession harbored a strong bias against governmental attorneys joining unions or other employee organizations. See, e.g., ABA Informal Ethics Opns., No. 917 (Jan. 25, 1966) (a government lawyer owes undivided loyalty to the agency for which he or she works and may not join a labor union). However, the American Bar Association subsequently discarded that position and recognized the right of government attorneys and corporate lawyers to organize "for the purpose of negotiating wages, hours, and working conditions" so long as they perform their duties in accordance with ... the Canons of Ethics. 2 ABA Informal Ethics Opns., No. 986 (July 3, 1967). The American Bar Association's Model Code of Professional Responsibility, EC 5-13 states in pertinent part that "[a]lthough it is not necessarily improper for a lawyer employed by a corporation or similar entity to be a member of an organization of employees, he should be vigilant to safeguard his fidelity as a lawyer to his employer, free from outside influences." Although in 1983 the American Bar Association replaced the Model Code of Professional Responsibility with the Model Rules of Professional Conduct, which is silent on the question, the bar association's current position appears to be that unionization is permitted as long as the attorney conducts himself in accordance with ethical rules.
We adopt this pragmatic approach. The number of lawyers who represent single employer clients, such as governmental agencies, has increased substantially in recent years. The relationship between a government lawyer and his client in terms of compensation and working conditions is different from that of the attorney who represents a number of different clients in his daily practice. Government lawyers have only one client, do not charge fees for their individual work, and their compensation generally is not related to a particular assignment but instead is related to the overall duties they perform. This does not diminish their duty of loyalty owed to their client or their obligation to conduct themselves in accordance with accepted ethical standards. However, the impersonality of the relationship might well weigh heavily in the need to organize for the purpose of collective negotiations.
We perceive no blanket, per se violation of the duty of loyalty owed by a lawyer to his client when government attorneys exercise their constitutional and statutory rights to organize for the purpose of collective negotiations. The growing phenomenon of single client lawyers requires a realistic accommodation between an attorney's professional obligation and the rights he or she may have as an employee.
There is an inherent tension in the attorney-client relationship, just as there is an inherent tension in the employer-employee relationship. In that context, it is important to note that an attorney's personal interests in securing equitable compensation and benefits are the same whether they are advanced by the attorney individually or by a union. In both cases, the attorney's stringent ethical obligations trump his personal interests. That cardinal principle must prevail in determining whether an attorney, in pursuit of an employee organization's objectives, oversteps ethical boundaries. That determination must rest on the application of specific ethical and disciplinary rules, most particularly the principles adopted by our Supreme Court, to insure the attorney's unfettered duty to represent the client faithfully, competently, and fairly.
*781 In its attempt to avoid application of these principles, the City conjures up a myriad of hypothetical, potential conflicts of interest that could result from collective negotiations. It asserts, for example, that an attorney who is a member of a union may consider how the outcome of a case will impact on his personal interests. He might take advantage of the City's confidential legal strategies. An attorney may be temporarily assigned to a labor department task, forcing him to advance a position that is inconsistent with his own interests and those of the union.
There is no reason to believe, however, that these types of situations are more likely to arise when an attorney is a member of a union. As we have noted, a non-union attorney may have personal interests that, to some extent, collide with an argument he is required to advance or a position he must advocate on behalf of his client. For example, a municipal attorney might be required to oppose the advance of employee benefits even though he would personally gain were he to adopt a contrary position. He might be required by his duty of loyalty to the City to oppose the implementation of personnel policies that either directly or indirectly would ultimately serve his personal interests. He may even be required to seek the incarceration of employees for engaging in an illegal strike even though a work stoppage would benefit him personally. The simple and overriding fact is that these conflicts would exist to the same extent whether or not the municipal attorney is a member of a union. In these and a host of other situations, the attorney's duty to his client must be accorded paramountcy and must prevail whether or not he is represented by a labor organization.
Candor requires us to add that not all of the concerns expressed by the City are fanciful. We recognize that the course we have taken is not free of obstacles. Public employees may not engage in a strike, and so we need not concern ourselves with that issue. But difficult questions will undoubtedly be raised in the future, such as whether a union representing municipal attorneys may sue the City or seek redress for labor law violations in other forums. So too, difficult questions may arise as to whether the City could punish an attorney-employee because of his union activities. We are also mindful of the possibility that unionization may put a strain on the attorney-client relationship, and may tend to diminish the client's confidence in the attorney's loyalty. Moreover, the action of the union or that of the municipality may create lasting antagonism. Such antagonism in the labor relations context is unfortunately commonplace. We do not underestimate the difficulty of providing solutions to these problems. But the constitutional and statutory rights to organize for the purpose of collective negotiations were not established for the ease and comfort of the judiciary. We are confident in the capacity of the parties, and ultimately the ability of judges, to resolve these and other questions.
We reject the City's argument that the Rules of Professional Conduct prohibiting multiple representation are applicable to the issues raised. These rules do not bar union membership. When an attorney joins a union and designates the union as his representative for collective negotiations, he does not by virtue of that act undertake legal representation of the union. Independent counsel will undoubtedly represent the Association. The relationship between the City's attorneys and the Association is not one of attorney-client.
We also disagree with the City's contention that unionization of the City's attorneys creates a perception of impropriety. RPC 1.7(c)(2). We acknowledge *782 that "the `appearance' doctrine is intended not to prevent any actual conflicts of interest but to bolster the public's confidence in the integrity of the legal profession." In re Opinion No. 569, 103 N.J. 325, 330, 511 A.2d 119 (1986) (citing In re Cipriano, 68 N.J. 398, 398, 346 A.2d 393 (1975); In re Opinion No. 415, 81 N.J. 318, 323, 407 A.2d 1197 (1979)). "Thus, it is that sometimes an attorney, guiltless in any actual sense, nevertheless is required to stand aside for the sake of public confidence in the probity of the administration of justice." Perillo v. Advisory Committee on Prof'l Ethics, 83 N.J. 366, 373, 416 A.2d 801 (1980) (quoting State v. Rizzo, 69 N.J. 28, 30, 350 A.2d 225 (1975)). Undoubtedly, the need to dispel all appearances of impropriety becomes even more compelling and acute when the attorney is a government lawyer. In re Opinion No. 415, 81 N.J. at 323, 407 A.2d 1197. When representation of public bodies is involved, our Supreme Court has recognized that the appearance of impropriety assumes an added dimension because "government attorneys... are more visible to the public." In re Opinion No. 569, 103 N.J. at 330, 511 A.2d 119.
The Court has also said that "the `appearance' of impropriety must be something more than a fanciful possibility." Ibid. "It must have some reasonable basis." Ibid. (citing Higgins v. Advisory Committee on Prof'l Ethics, 73 N.J. 123, 373 A.2d 372 (1977)). Applying that principle, we are satisfied that ordinary, knowledgeable citizens acquainted with the facts would see nothing amiss in extending the organizational rights and benefits afforded by our Constitution and statutes to the City's attorneys.
For the sake of completeness, we add that our holding is supported by other jurisdictions that have considered the question. See Santa Clara County Counsel Attorneys Ass'n v. Woodside, 7 Cal.4th 525, 553, 28 Cal.Rptr.2d 617, 869 P.2d 1142, 1157-58 (Cal.1994) (en banc) (attorneys in the public sector may organize and sue employer for labor law violations); Chiles v. State Employees Attorneys Guild, 734 So.2d 1030, 1036 (Fla.1999) (government lawyer "does not violate ethical standards simply by being a member of a union"); State ex rel. Chiles v. Public Employees Relations Comm'n, 630 So.2d 1093, 1095 (Fla.1994) (Commission statutory certification process does not infringe upon [Supreme Court's] jurisdiction over attorneys); City of Philadelphia v. Pennsylvania Labor Relations Bd., 163 Pa. Commw. 628, 633, 641 A.2d 709, 712 (Pa. Commw.1994) ("There is nothing in the Rules of Professional Conduct which prohibits an attorney from being a member of a union"). These decisions stand for the proposition that government lawyers have an interest in dealing with their employer concerning compensation, benefits and other core working conditions, but this interest is inherent in every employment relationship, that all attorneys have an interest in addressing these issues whether or not they organize for the purpose of collective negotiations, and that interjection of a union does not alter this interest, but instead changes the method of communicating it to the employer. We agree with these observations.

IV.
We next consider the City's argument that the Commission infringed upon the power of the Supreme Court over the practice of law. The nature and extent of the Court's authority and obligation are set forth in the 1947 constitution, which provides in pertinent part that "[t]he Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted," and *783 "shall make rules governing the administration of all courts in the State and ... the practice and procedures in all such courts." N.J. Const., art. VI, § 2, ¶3.
"`The intent of the 1947 Constitutional Convention was to vest the Supreme Court with the broadest possible administrative authority.'" Passaic County Probation Officers' Ass'n v. County of Passaic, 73 N.J. 247, 251, 374 A.2d 449 (1977) (quoting Lichter v. County of Monmouth, 114 N.J.Super. 343, 349, 276 A.2d 382 (App.Div.1971)). As expressed by Chief Justice Weintraub, the Constitution confers upon the Court "plenary responsibility for the administration of all courts [of this state]," State v. De Stasio, 49 N.J. 247, 253, 229 A.2d 636 (1967), and such responsibility "implies power reasonably necessary" for achieving that mission, In re Mattera, 34 N.J. 259, 272, 168 A.2d 38 (1961). The constitutional mandate given to the Court transcends the power of the other branches to enact statutes or promulgate regulations inconsistent with the authority so granted. See Passaic County Probation Officers' Ass'n v. County of Passaic, 73 N.J. at 255, 374 A.2d 449. Resolution of the ethical propriety of an attorney's conduct is thus "within the exclusive province of the Supreme Court." Pickett v. Harris, 219 N.J.Super. 253, 260, 530 A.2d 319 (App.Div.1987), appeal dismissed by 114 N.J. 471, 555 A.2d 598 (1989). "[I]t is safe to say that generally, almost without exception, no branch of government has the power to authorize either explicitly or implicitly, conduct by attorneys that violates the ethical standards imposed by the judiciary." In re Opinion No. 621, 128 N.J. 577, 590, 608 A.2d 880 (1992). "Neither the Legislature nor the Executive has any power to overrule attorney ethical standards promulgated by [the] Court." In re Opinion No. 621, 128 N.J. at 591, 608 A.2d 880 (citing
In re Genser, 15 N.J. 600, 607, 105 A.2d 829 (1954)). Clearly, the Commission has no authority to override the Supreme Court's constitutional power.
This much conceded, the Commission's decision did not authorize any conduct barred by an ethical standard adopted by the Court. The Commission's determination did not insulate the City's attorneys from the Court's authority. The pivotal issue is whether the Commission's statutory certification process intrudes upon the court's jurisdiction over attorneys. We find that collective negotiations by the City's attorneys does not encroach upon the Court's authority in the absence of any action by the Court to the contrary. As a matter of comity and respect for the other branches of government, we accord deference to the Commission's decision. We again add that our holding comports with decisions of other jurisdictions. See Chiles v. Public Employees Relations Comm'n, 630 So. 2d at 1095; City of Philadelphia v. Pennsylvania Labor Relations Bd., 163 Pa. Commw. at 633, 641 A.2d at 712.

V.
N.J.S.A. 40A:9-139 requires every municipality to adopt an ordinance providing for the appointment of a municipal attorney. The City implemented that statute by enacting Newark Ordinance § 2.6-7(a), which provides that the corporation counsel may appoint legal assistants, and that "[a]ll said persons [are to] serve at the pleasure of the corporation counsel." The City argues that unionization of its attorneys unlawfully burdens the corporation counsel's power.
In support of this contention, the City heavily relies upon Golden v. County of Union, 163 N.J. 420, 749 A.2d 842 (2000) and Walsh v. State, 290 N.J.Super. 1, 13, 674 A.2d 988 (App.Div.1996) (Skillman, *784 J.A.D., dissenting), rev'd on dissent, 147 N.J. 595, 689 A.2d 131 (1997). In Golden, the plaintiff, an assistant prosecutor, was fired when he complained about a work assignment. Golden v. County of Union, 163 N.J. at 423-24, 749 A.2d 842. He asserted that his termination was unlawful because he was not presented with formal, written charges or granted a hearing, as required by an employment manual. Id. at 424-26, 749 A.2d 842. The defendants argued that the rights conferred by the employees' manual were inconsistent with N.J.S.A. 2A:158-15, which provides that assistant prosecutors "hold their appointments at the pleasure of the respective prosecutors." Id. at 425, 749 A.2d 842. The Court held that "[t]he statute trump[ed] whatever implied contract may have existed between the parties." Id. at 431, 749 A.2d 842. In arriving at that conclusion, the Court reasoned that "[t]he Legislature's mandate as embodied in N.J.S.A. 2A:158-15 would be thwarted if prosecutors could, by an implied agreement contained in an employment manual, abrogate or otherwise encumber their statutory prerogatives." Id. at 433, 749 A.2d 842.
In Walsh, the Court adopted the dissenting opinion of Judge Skillman in which he concluded that the Public Defender's promise of a future promotion made to a deputy assistant was unenforceable. Walsh v. State, 147 N.J. at 595, 689 A.2d 131. The promise was held to be incompatible with the unfettered power of the Public Defender granted in N.J.S.A. 2A:158-6 to "hire, discharge, transfer, demote or withhold promotion from an assistant deputy public defender." 290 N.J.Super. at 13, 674 A.2d 988. Judge Skillman concluded that enforcement of the promise would "transform a statutorily mandated at will employment relationship into a contract of employment ... binding upon successors to the Public Defender in office when the purported contract was made." Id. at 17, 674 A.2d 988.
The exact implications of Golden and Walsh are not altogether clear. It is arguable that collective negotiations concerning procedures for granting promotions or salary increases would infringe upon the managerial prerogatives of the City's corporation counsel. But see Council of N.J. State College Locals v. State Bd. of Higher Educ., 91 N.J. 18, 33, 449 A.2d 1244 (1982) ("procedures for implementing substantive decisions ... pose no significant threat of interference with the public employer's ability to make substantive policy determinations") (citing In re Local 195, 88 N.J. 393, 417, 443 A.2d 187 (1982)); State v. State Supervisory Employees Ass'n, 78 N.J. 54, 90-91, 393 A.2d 233 (1978) ("promotional criteria are not mandatorily negotiable while promotional procedures are so negotiable"). We express no view on the subject.
Suffice it to say, the issue presented here is entirely different. Undoubtedly, there are issues and areas that cannot be the subject of negotiations because they are preempted by statute or otherwise inconsistent with corporation counsel's statutory power. We have no occasion here to set the exact boundaries of permissible collective negotiations. We are concerned here with the much broader question concerning the right of the City's attorneys to organize and join a union. That right is not forbidden by statute or ordinance.

VI.
The City's final argument is that its attorneys are supervisors, managerial executives or confidential employees and are thus barred from organizing or joining a union under N.J.S.A. 34:13A-5.3. The operative statutory language reads as follows: *785 public employees shall have ... the right ... to form ... any employee organization ... provided, however, that this right shall not extend to ... managerial executives, or confidential employees... nor ... shall any supervisor having the power to hire, discharge, discipline, or to effectively recommend the same, have the right to be represented in collective negotiations by an employee organization that admits nonsupervisory personnel to membership, and the fact that any organization has such supervisory employees as members shall not deny the right of that organization to represent the appropriate unit in negotiations....
N.J.S.A. 34:13A-5.3.
At the outset, we reject the City's argument that its attorneys are forbidden from organizing because they act as supervisors to support staff such as paralegals, administrative assistants or interns. Whether or not the attorneys are supervisors is essentially irrelevant. The statutory language bars supervisors from being represented in collective negotiations by an employee organization that admits nonsupervisory personnel. The statute provides no blanket prohibition against supervisors joining a union. The Director of Representation determined that supervisory and nonsupervisory personnel were not to be represented by the same employee organization. Further, the Director structured the negotiating unit to comport with the statute by excluding the first assistants and section chiefs who have supervisory authority over the lower level, remaining employees. We hold that the negotiating unit delineated by the Director is appropriate, meets all statutory requisites, and that the supervisory status of the attorneys with respect to the support staff does not negate their right to organize for the purpose of collective negotiations.
We also find no sound basis to disturb the Director's finding that the City's attorneys are not "managerial executives." The term "managerial executives" refers to persons who "formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices." N.J.S.A. 34:13A-3(f). In In re N.J. Turnpike Auth., 150 N.J. 331, 696 A.2d 585 (1997), the Supreme Court elaborated on the statutory definition by noting:
"A person formulates policies when he develops a particular set of objectives designed to further the mission of [a segment of] the governmental unit and when he selects a course of action from among available alternatives. A person directs the effectuation of policy when he is charged with developing the methods, means and extent of reaching a policy objective and thus oversees or coordinates policy implementation by line supervisors.... Whether or not an employee possesses this level of authority may generally be determined by ... three factors: (1) the relative position of that employee in his employer's hierarchy; (2) his functions and responsibilities; and (3) the extent of discretion he exercises."
Id. at 337, 696 A.2d 585 (quoting Borough of Montvale, P.E.R.C. No. 81-52, 6 N.J.P.E.R. ¶ 11259 (1980)).
Within this analytical framework, we emphasize that all of the attorneys represented by the Association are lower level employees in the office of corporation counsel. It is undisputed that they report to a section chief who reports to one of the two first assistants who, in turn, reports to corporation counsel. While the lower level attorneys may occasionally make recommendations concerning the formulation of policy, they are not policy makers. They *786 do not develop objectives to further the City's mission. They, instead, render advice on legal questions and represent the City in litigation. As attorneys, they develop legal strategies to advance legislative and administrative policies, but this function is not the equivalent of "oversee[ing] or coordinat[ing] policy implementation by line supervisors." While the attorneys are vested with some degree of discretion, it is plain from the record that they are closely supervised and that their power and authority are narrowly circumscribed.
We do not regard the City's attorneys as "confidential employees." The term "confidential employees" refers to "employees whose functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make their membership in any appropriate negotiating unit incompatible with their official duties." N.J.S.A. 34:13A-3(g). In Township of Wayne v. AFSCME, Council 52, 220 N.J.Super. 340, 532 A.2d 255 (App. Div.1987), we suggested that access to confidential labor relations information creates sufficiently conflicting loyalties to qualify an employee as confidential. Id. at 346, 532 A.2d 255. However, in Turnpike Authority, the Supreme Court rejected that thesis, holding that "mere access to such information does not automatically confer confidential employee status." 150 N.J. at 357, 696 A.2d 585. The Court concluded that "those who have more than `mere access' to confidential information those who `assimilate it, evaluate it, analyze it and provide significant information to their supervisors'must be excluded as confidential employees." Ibid.
In reaching this conclusion, the Court noted a significant disparity between the definition of "confidential employee" proposed by Governor Cahill in his conditional veto of Assembly Bill No. 520 and the definition [ultimately adopted] by the Legislature. Ibid. Governor Cahill proposed that the term include a specific reference to those with "`access to confidential personnel files or information concerning the administrative operations of a public employer'...." Ibid. (quoting Governor's Veto Statement to Assembly Bill No. 520 at 6 (Feb. 22, 1973)). The Legislature declined to adopt that specific exclusion. The Court reasoned that this omission "suggest[ed] that the Legislature did not mean to preclude those with mere access to confidential general personnel information from joining a collective negotiating unit." Ibid.
"The baseline inquiry remains whether an employee's functional responsibilities or knowledge `would make their membership in any appropriate negotiating unit incompatible with their official duties.'" Id. at 358, 696 A.2d 585 (quoting N.J.S.A. 34:13A-3(g)). There must be some substantial nexus between the employee's functional responsibilities in having access to confidential information and the collective negotiations process. "[M]ere physical access to information without any accompanying insight about its significance or functional responsibility for its development or implementation may be insufficient in specific cases to warrant exclusion." Ibid.
In that context, there is no evidence that the information to which the attorneys have access is significant in the context of their work responsibilities and the collective negotiations process. It is to be recalled that those having such informationthe attorneys assigned to labor law tasks, section chiefs, and first assistants were excluded from the negotiating unit.
The City asserts that it should have been afforded a hearing on this subject. Our examination of the voluminous record, however, does not indicate that a specific request for a hearing was made respecting *787 the precise issue raised. N.J.S.A. 52:14B-2(b). Beyond this, there is no genuine issue of material fact that requires further elucidation. See Sloan v. Klagholtz, 342 N.J.Super. 385, 392, 776 A.2d 894 (App. Div.2001); Quad Enterprises v. Borough of Paramus, 250 N.J.Super. 256, 263, 593 A.2d 1227 (App.Div.1991).
Despite the vagaries inherent in the statutory definition of "confidential employees," we are thoroughly satisfied that the City's lower level attorneys do not so qualify. If the Legislature intended to prohibit all municipal attorneys from joining a union, it would have said so, as it did in the case of deputy attorneys general under N.J.S.A. 52:17A-7. We see no valid basis for vitiating the Commission's determination.
Affirmed.