MASSETT BUILDING COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, ET AL., PLAINTIFFS-APPEL-LANTS, v. HAROLD W. BENNETT. ET AL., DEFEND-ANTS-RESPONDENTS.

Argued January 23, 1950—Decided February 14, 1950.

*Mr. Murray Fredericks* argued the cause for the appellants.

*Mr. Henry F. Schenk,* Deputy Attorney General, argued the cause for the respondents (*Mr. Theodore D. Parsons,* Attorney General).

The opinion of the court was delivered by

VANDERBILT, C. J. In April, 1948, thirty-four taxpayers of Atlantic City presented their affidavit under *R. S.* 40 :6–1 to the Honorable Howard Eastwood, then a justice of the former Supreme Court, who in May entered an order directing a summary investigation into the affairs of the city. Later he entered an order appointing Harold W. Bennett of the Camden bar, and Edmund D. Bowman, a certified public accountant of New Jersey, as experts, under the statute, to prosecute the investigation. On September 15, 1948, the Honorable Frank T. Lloyd, Jr., was designated as Assignment Judge of the Law Division of the Superior Court in Atlantic County and by virtue of *R. S.* 1 :1–22 (i) took over the authority theretofore exercised by Judge Eastwood.

In July, 1948, the experts under the terms of the statute began to check the city records, interview witnesses, and to obtain data from their books and in December, 1948, they began to conduct public hearings at which Mr. Bennett presided at Judge Lloyd's order. These hearings have been much interrupted by litigation in both the Federal and State courts.

On October 5, 1949, the twenty-three plaintiffs herein, who are either mentioned in the taxpayers' affidavit which instituted the investigation or who have been subpoenaed or threatened with subpoena as witnesses in the investigation, filed their complaint in the Chancery Division against Judge

Lloyd, the two experts and three lawyers who had been appointed as their legal assistants. The plaintiffs allege in their complaint that the actions and acts of the experts were illegal and oppressive, in that they have examined plaintiffs' private books, papers and records, extracted data therefrom, and made such information public, thereby violating the plaintiffs' rights of property and privacy; required plaintiffs to answer questions under threat of contempt; insisted on the divulgence of transactions in no way connected with the affairs of Atlantic City; and ordered one of the plaintiffs to testify to "all transactions which the experts deem pertinent, material and relevant to their investigation under the charges involving Convention Hall." In general the plaintiffs contend that the investigation and the hearings are not only unconstitutional but also in and of themselves illegal and violative of the plaintiffs' rights. They seek injunctive relief restraining the defendants from enforcing the provisions of *R. S.* 40:6–1 *et seq.,* and also the aid of the Chancery Division to order the defendants to return to the plaintiffs all data, records and information that may have been obtained from said plaintiffs either with or without the aid of subpoena. The defendants filed an answer admitting some and denying others of the allegations of the complaint and raising the separate defenses of laches, *stare decisis* and the statute of limitations. Defendants then moved for summary judgment on the pleadings, which was granted. From this judgment the plaintiffs appealed to the Appellate Division, and the defendants petitioned this court for certification, which was allowed.

## I.

■ The plaintiffs contend that the act in question charges a judge with the performance of nonjudicial duties in violation of Article III of the Constitution of 1947 distributing the powers of government among three distinct branches—the legislative, executive and judicial—and providing that "no person or persons belonging to or constituting one branch

shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution." The provisions of this Article may be traced to Article III of the Constitution of 1844, the division of powers now being *"among* three distinct branches" instead of *"into* three distinct departments." The new language would seem to be, if anything, broader than the old. As we observed in *Mulhearn v. Federal Shipbuilding and Dry Dock Co.,* 2 *N. J.* 356, 363 (1949), the doctrine of separation of powers is not peculiar to New Jersey; it exists in one form or another in almost every American constitution; and it has nowhere been construed as creating three mutually exclusive watertight compartments. To do so would render government unworkable and the slave of a doctrine that has for its beneficial purpose the prevention of despotism that inevitably results from the concentration of all the powers of government in one person or in one organ of government. So in almost every state we find seeming exceptions to the doctrine from the earliest times to the present day, *Baldwin, The American Judiciary, Chapter II* (1914), some of which are upheld, others of which have been declared unconstitutional. While no rule of thumb will cover all the cases, in general it may be said that no deviation from the constitutional provisions incorporating the doctrine of the separation of powers will be tolerated which impairs the essential integrity of one of the great branches of government. Thus one of the earliest cases to come before the Supreme Court of the United States involved a statute casting on the Federal circuit courts the duty of passing on the applications of invalid Revolutionary soldiers for provisions, subject first to the consideration and suspension of the Secretary of War and then to the revision of Congress. Such executive and legislative action being incompatible with the unfettered exercise of judicial power. the court declined to act, *Hayburn's Case,* 2 *Dall.* 409, 1 *L. Ed.* 436 (1792).

The case chiefly relied on by the plaintiffs, *In re Richardson,* 247 *N. Y.* 401, 160 *N. E.* 655 (1928), involves the same principle. There the statute cast on a justice of the Supreme

Court of New York the mandatory duty, at the direction of the governor of making an investigation of charges against a public official and to report the evidence with his findings and conclusions to the governor. The proceedings took the justice away from his judicial work for months. Chief Judge Cardozo, speaking for the Court of Appeals, held that "The range of our decision will not be misapprehended. We deny the power of the Legislature to charge a justice of the Supreme Court with the duties of a prosecutor in aid of the Executive," in violation of the provisions of the New York constitution precluding such judges from holding any other public office or trust, except that they shall be eligible to serve as members of a constitutional convention. The New York statute is subject to the fundamental vice that it subjects a justice to the direction and supervision of another branch of the government as in *Hayburn's Case,* in violation of the principle of judicial independence.

The distinctions between the *In re Richardson case* and the case at bar are obvious. There the statute cast a mandatory duty on the justice; here the judge "may" act "in his discretion." There the justice acted under an order from the governor directing him to investigate, and he was required to report to the governor; here, if he does see fit to act, he does not report to anyone. He "may cause the results of such investigation to be published in such manner as he may deem proper," *R. S.* 40:6–1. There the proceedings were directed to the definite end of an executive removal of a local officer; here the statute had no such definite goal. The most that may happen at the end of the investigation, as such, is publication of the results. There the judicial action infringed on a specific constitutional prohibition; here it is still to be demonstrated that an investigation into the affairs of local government is not judicial.

■ The power of investigation cannot be assigned to any one of the branches of government exclusively. The Legislature has inherent power to conduct investigations as the basis for future legislation. By Article V, Section IV, paragraph 5, of the Constitution the Governor is empowered to "cause

an investigation to be made of the conduct in office of any officer or employee who receives his compensation from the State of New Jersey, except a member, officer or employee of the Legislature or an officer elected by the Senate and General Assembly in joint meeting, or a judicial officer." Even more familiar are the investigations made by many of the administrative agencies, the state police, the county prosecutors and their representatives, and the police and other local municipal officials. Judicial investigations are of the most varied sorts, ranging from grand jury investigations to the taking of testimony in proceedings in lieu of prerogative writs, from discovery proceedings to investigations by probation officers in aid of the court in imposing sentences. It cannot be said an investigation into the public affairs of a municipality or a county is not judicial in nature when it may lead to a civil suit for damages, or a proceeding in lieu of a prerogative writ, or a grand jury indictment or any one of a variety of statutory actions. That the statute stops short with a publication of the results thereof does not prevent the action being judicial in character, for it may lead to subsequent judicial action.

Even if the investigation were not judicial in nature, that fact alone would not render it unconstitutional, for our judges, in common with most state judges and unlike the Federal judges, have traditionally performed many nonjudicial duties as legislative agents. A cursory examination of the Revised Statutes discloses that judges are often called upon to *make nonjudicial appointments,* such as, *e. g.,* county park commissioners, *R. S.* 40:37–97 and 98; morgue keepers, *R. S.* 40:21–33; commissioners to survey the boundaries between municipalities, *R. S.* 40:18–15; suitable persons to examine animals found in a maimed, sick or disabled condition, *R. S.* 4:22–54; board of water commissioners in cities of second class, *R. S.* 40:175–22 to 22.2. Judges have been authorized, moreover, to *serve on boards or commissions* in a nonjudicial capacity, as *e. g.,* a county judge on the board of trustees of the county parental school, *R. S.* 9:11–1; a county judge on the board of review upon classification and

reclassification of bidders, *R. S.* 40 :25–19. Judges, furthermore, are given by statute power with respect to granting licenses, as *e. g.,* exercising discretionary power with respect to *granting licenses,* to sell pistols and revolvers at retail, *R. S.* 2 :176–24; issuing permits to purchase pistols and revolvers, *R. S.* 2 :176–34; issuing a permit "after investigation" to carry a concealed fire arm, *R. S.* 2 :176–44 and also to revoke it, *R. S.* 2 :176–45; and permitting the purchase and possession of a machine gun or automatic rifle, *R. S.* 2 :176–52 *et seq.* Next must be mentioned a *heterogeneous group of nonjudicial responsibililies* delegated to judges by the Legislature, such as investigating, on petition filed, whether or not a municipality has defaulted on its notes and if so, filing an order on the basis of which the Municipal Finance Commission shall exercise its statutory powers, *R. S.* 52 :27–2; the duty to report to municipalities with regard to degrading conditions existing therein, *R. S.* 9 :21–1 and 2; the power to organize clinics in the several counties for the study of the physical and mental condition of criminal defendants, *R. S.* 2 :192–1.1; aiding corporations for the prevention of cruelty to children, *R. S.* 9 :5–5; authorizing certain judges to perform the marriage ceremony, *R. S.* 37 :1–13; requiring local judges to clip and burn the ears of fox and woodchuck and to issue bounty certificates, *R. S.* 23 :4–59 and 60; and requiring local judges, in the absence of the coroner, to hold inquests in certain cases of deaths within the county, *R. S.* 40 :40–5 *et seq.* Finally, there are the various statutory proceedings committed by the Legislature to the trial courts, of which appeals from transfer inheritance tax proceedings formerly to the Ordinary, now to the Appellate Division of the Superior Court, *R. S.* 54 :34–13, and application for the recount of votes following an election, *R. S.* 19 :28–1 *et seq.,* may stand as typical examples. The statutory nature of such proceedings is attested by the fact that any reviews thereof that may be permitted were not by appeal but formerly by *certiorari, In re Roebling's Estate,* 91 *N. J.*

*Eq.* 72 (*E. & A.* 1919), and now by proceedings in lieu of a prerogative writ.

The widespread delegation of nonjudicial duties to state judges is not peculiar to New Jersey. It springs from Colonial and thence from English practice, *Baldwin, The American Judiciary,* 20–24. It reflects an intent of the Legislature to seek an impartial and independent tribunal for the decision of matters deemed vital to the welfare of the community. It is to be observed, however, that in none of the instances of legislative delegation of statutory powers to the judiciary has there been any attempt to make the courts subservient to or under the supervision of either the Legislature or the Governor. On the contrary, these responsibilities have been delegated to the judiciary by the Legislature, as we have said, because of their impartial and independent positions. Nor can the judges be obliged to carry out these legislative grants of authority if they interfere with the functioning of the courts either in the amount of time or attention they detract from judicial activity or in involving the courts in situations which may reflect on their reputation in the community for fairness, impartiality and independence. There has been a tendency in recent years to repeal some of the legislation casting nonjudicial burdens on the judges, as for example, in the amendment of acts providing for the appointment by the chancellor of three directors to the board of directors of stock and mutual life insurance companies, *P. L.* 1948, *c.* 377, *p.* 1554; and the amendment of *R. S.* 37:1–13 so as to relieve judges of the Superior Court of authority to perform marriage ceremonies. A legislative request, however, for the judiciary to act with respect to any particular subject matter is not to be lightly declined and such matters are to be passed upon by this court in the spirit of comity that should prevail between the three branches of government.

It is against this background of our constitutional history that the plaintiffs attempt to argue that the statute is unconstitutional. The statute in its essence has been on the books for eighty years, *P. L.* 1879, *p.* 27. The constitutionality of this act and of a supplement thereto, *P. L.* 1898, *p.* 155,

was upheld in *Hoboken v. O'Neill*, 74 *N. J. L.* 57 (*Sup. Ct.* 1906), the court stating:

> "This statute is evidently a very useful public act. It enables those entitled to know to ascertain the true condition of municipal expenditures. It requires that property owners and taxpayers only shall inaugurate the proceeding, and it places the appointment of experts in the discretion of the justice of the Supreme Court to whom the application is presented. The justice is not required to appoint experts, and may make such investigation on his own account, to see if the public interests require that they be appointed. He can control the character of the investigation and avoid unnecessary expenditure, and at the same time secure the necessary public information to allay criticism, if criticism is unjust, or to warrant other proceedings for the protection of the municipality, if the acts of the public officials are shown to justly demand condemnation."

The statutes questioned in *Hoboken v. O'Neill* were again unsuccessfully challenged on constitutional grounds in *Park Ridge v. Reynolds*, 74 *N. J. L.* 449, in the same year in the Court of Errors and Appeals.

In *North Bergen Township v. Gough*, 107 *N. J. L.* 424 (*Sup. Ct.* 1931), the constitutionality of *P. L.* 1907, c. 3, *p.* 12 (a reworking of the earlier statutes) as amended and supplemented in 1911, was questioned, only to be again sustained. Finally, in this very investigation, the constitutionality of the statute was again questioned, *In re Wellhofer*, 137 *N. J. L.* 342 (*Sup. Ct.* 1948), only to have Mr. Chief Justice Case remark, "Finally, as point nine, it is contended that the statute itself is unconstitutional. The contrary has been held too often to require fresh consideration here." We have examined all of the cases cited by the plaintiffs, mostly from New York, and we find none of them that are inconsistent with the principles enunciated here under our Constitution. We therefore reaffirm the constitutionality of the questioned statute.

## II.

The plaintiffs also urge that *R. S.* 40:6–1 violates the due process clause of the Fourteenth Amendment to the Federal Constitution and Article I, paragraph 1 of the New

Jersey Constitution guaranteeing one's natural and inalienable right to life, liberty and property, and paragraph 7 relating to freedom from searches and seizures. The plaintiffs' argument is difficult to follow. No particular language in the statute is challenged, but rather the course of conduct under it. But the course of conduct here pursued has followed that taken in the earlier cases herein cited where the constitutionality of the statute was challenged, and in those cases the conduct of the investigation by experts was approved. In general, the established course of conduct in municipal investigations follows accepted judicial procedure. If in any particular instance any constitutional right is invaded, the obvious remedy is not to attack the validity of the statute or to seek to enjoin all proceedings thereunder, but to move to have the offending subpoena quashed by the court out of which it issued. Again, if the plaintiffs or other witnesses are charged with contempt for failure to comply with a subpoena which violates their constitutional rights, *Rule* 3:80 assures them of a fair and impartial hearing.

The judgment of the Chancery Division of the Superior Court is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.